## WINKLE et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. July 9, 1923.)

No. 6285.

**1. Injunction ⬤➡223(2)—Assault on one employed in place of striker held violation, even though he had left employment before assault.**

Injunction restraining interference with employees of railway company whose former employees were on strike, in going to and from their work or remaining at such work, or threats or suggestions of danger, violence, or personal injury against them, etc., was violated by assaulting one who had accepted employment in place of striker because of such fact even though, before the assault, he had left the employment.

**2. Criminal law ⬤➡693—Objection at trial to admission of evidence obtained without search warrant too late.**

Where defendants charged with contempt knew that search and seizure had been made without search warrant long before trial but made no effort to prevent use of the property seized until it was offered in evidence, it was then too late to object.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

L. F. Winkle and others were convicted of contempt of court, and they bring error. Affirmed.

Clif. Langsdale, of Kansas City, Mo., for plaintiffs in error.

Charles C. Madison, U. S. Atty., of Kansas City, Mo. (S. M. Carmean, Asst. U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. The plaintiffs in error were on a trial to a jury found guilty of contempt of court, having been charged by information with violating an injunction granted by the court below in an equity cause pending therein entitled Chicago & Alton Railway Co. v. International Association of Machinists et al. The terms of the injunction, alleged to have been violated, set out in the information, are:

"Not to interfere in any manner with the employees of the complainant in going to and from their daily work or in remaining at such work, except by such peaceful persuasion as announcing the so-called strike and requesting

and persuading employees and would-be employees not to work for the complainant, but such persuasion shall not be by profane, abusive, libelous or threatening epithets or threatened injury and shall not obstruct any unwilling listener or importunately follow his steps.

"Not to interfere in any manner with persons desiring to go into or upon the buildings or property of complainant for the purpose of working for the complainant, except by peaceful persuasion.

"Not to make any threats or suggestion of danger, violence or personal injury of any kind against the employees or would-be employees of complainant, or the members of their families, and not to commit any act of force or violence or any injury against any such person or the members of his family or his property.

"Not to interfere by violence or threats of violence in any manner with any person desiring to be employed by the complainant."

It then charges:

"That on or about the 28th day of August, 1922, at Slater, Saline county, Mo., the defendants, L. F. Winkle, L. R. Johnson, Barney Mayfield, Max Bates and Emmett Todd, whose true first names other than above set forth are to this affiant unknown, then and there being, within the Western District of Missouri, and within the jurisdiction of this court, did then and there unlawfully, willfully, knowingly and contemptuously commit contempt against the dignity and authority of this honorable court with intent then and there to disobey, resist and violate the lawful orders and decree as contained in said injunctive order aforesaid, and willfully obstruct its lawful processes by acts and conduct as follows:

"That on said 28th day of August, 1922, at Slater, Mo., the above-named defendants, acting in their own behalf, together with others to these affiants unknown, and aiding, assisting, combining, conspiring and agreeing with the persons so enjoined, as aforesaid, did then and there by force and violence seize one G. H. Gifford, who was an employee and a would-be employee of said Chicago & Alton Railway Company at Slater Mo. and did force him into a certain automobile and convey him against his will to a place remote from the place of his employment, and did at said place brutally assault, beat and bruise the said G. H. Gifford, and did take from said G. H. Gifford money and other valuables belonging to him, and did command him to cease his employment with the said Chicago & Alton Railway Company and commanded him to leave Slater, Mo., and not return, with intent thereby to frighten, coerce and intimidate the said employee and would-be employee to leave the employment of said railroad company, all in disobedience, resistance and violation of the lawful orders of this court and in contempt thereof, contrary to the authority and dignity of this court and the laws of the United States."

The charge against one of the respondents was dismissed at the trial for insufficiency of the evidence against him.

The evidence on the part of the government tended to show that the employees of the railway company's machine shop were on a strike, and that Gifford, the person assaulted and robbed, was at the time and had been for some time prior thereto in the employ of the railway company, having taken the place of one of the striking employees at Slater, Mo. He testified that—

At 11 o'clock a. m., of August 28th, he quit work at the shops, having obtained five days' leave of absence to go to Kansas City, Mo. Another employee by the name of Gibbons accompanied him. Before leaving he drew part of the money from the chief clerk of the company, which he had on deposit with him, no part of which was for wages. He left between $300 and $400 of his deposit with the company at the time. He drew $35 and had $1 of his own. The money he drew consisted of two $5 bills, and the balance in silver and dollar bills. He changed the two $5 bills, five paper dollars, and $5 in silver for a $20 bill from George Cole, a colored man. On the way to the depot they

were stopped by a picket, who asked him where he had been. He told him: "I had worked at the railway shop and was on my way to Kansas City." He told me I would have to see Winkle. I asked him why, as I was not a union man, and he said "Winkle was the big boss of the union and see what he wanted to do with me." Another man came up, who was trying to bully me, and we went to see Winkle. Winkle called us scabs and asked what I was going to do, and I told him I was going to Kansas City. He threatened me about coming back to work and I told him I wouldn't. Just then a car drove up with Mayfield in a Buick. Seven or eight other men came up, when Winkle said, "If you want to get out of town, get in this car, and we'll take you to Marshall." I got in the back seat and Winkle got in the seat with Mayfield. The two men who got in the back seat with me were working in the shop. When they came to the forks of the road, there are three roads, one leading to Marshall; they drove up a little lane that ran off. When I asked what was the idea, he said, "I have no chains, and it is raining, and I don't want to go to Marshall in this rain." They stopped there about two minutes, when a Dodge car and a Chevrolet drove up, and they then told me to, "Get out of that car, you scab." I got out. They told me how low down I was for working there taking the bread out of other people's mouths, and I tried to explain that I wanted to make some money myself, because they were starving was no use for me to starve. They made me take off my clothes and took my money. One fellow took my watch off, and another fellow took my shoes off, and Winkle hit me on the head, leaving a mark on my head. Another car came up, and they pulled us back in the car and drove back to the main road towards Marshall. The other two cars were still following. After they had gone four or five miles further, they drove on to another side road and stopped the car, these two cars still following, and Winkle and Parr said: "This is where we are going to finish you. Dead men tell no tales." Parr got a rope and began twisting a knot in it, when Winkle said: "He has got some more money on him. He has been working too long to have just this money. Make him take off his clothes again." They searched me again, but I had no more money, but they took my ring off. I told them it was my mother's wedding ring and to let me have it. Winkle said: "This is a pretty good ring, I will keep it." And stuck it in his pocket. They kicked Gibbons around and then put us back in the car and drove us towards Marshall. They put us off about three miles from Marshall and told us to walk down the railroad track to Marshall. When they came to Marshall they went to the city hall and told the assistant city marshal about it, and he arrested them. He locked them in jail and then they got the chief of police. Mayfield later told him "I will see that you get that watch and ring." He would mail it to him, but not from Slater.

He identified each of the defendants, as participating in the assault and robbery. Gibbons' testimony was practically to the same effect. Other witnesses identified the defendants in the Buick car on the road from Slater to Marshall.

There was evidence that printed copies of the injunction had been served on most of the defendants, that four printed copies had been posted at public places in Slater, and also published in the leading newspaper published at and circulating in Slater.

A witness testified that he heard Mayfield tell Johnson:

"I would like for you to get word to my wife about some money I have there that she knows nothing about, a $20 bill. It is in the shed or barn in a cigar box covered up with hay or some rubbish."

Thereupon a deputy marshall went to Mayfield's residence and in an open barn or shed found the cigar box and in it a $20 bill, which was identified as the $20 bill Gifford had obtained from Cole; the box and bill being introduced in evidence against defendants' objections. The

objection to this evidence was that the search was made without a proper search warrant. To the overruling of the objection defendants saved an exception.

The state license to the Buick car in which the respondents rode was shown to have been issued to the defendants Winkle and Mayfield.

While there are a number of errors alleged, there are only two which require consideration; the others are either frivolous or not of sufficient importance to require consideration, as upon the testimony taken as a whole there can be no doubt that the verdict of the jury was based on substantial, and we may say conclusive, evidence. Unless the court erred in either of the rulings hereafter referred to, the judgment must be affirmed.

Section 269, Judicial Code, as amended by the Act of February 26, 1919, 40 Stat. 1181 (section 1246, Comp. St. Ann. Supp. 1919), provides:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

See Horning v. District of Columbia, 254 U. S. 135, 41 Sup. Ct. 53, 65 L. Ed. 185; Harrington v. United States (C. C. A.) 267 Fed. 97.

It is claimed that as Gifford had told defendants that he was no longer in the employ of the railway company, the assault was not a violation of the injunction. But as a matter of fact, he still was in such employ, and his statement to Winkle was to escape the assault, and was merely a promise not to return to work for the railway company. He was on a five-day leave of absence, had not drawn any wages due him, and had several hundred dollars of his money on deposit with the company.

[1] But even if it were true that he had left the employment, the assault by reason of the fact that he had before then accepted employment from the company in place of a striker was just as much a violation of the injunction as if he were still employed there. The effect would be the same, as it would prevent others from taking employment in place of those who had left on the strike.

[2] The other objection that the $20 bill was obtained by a search without a search warrant is equally without merit. Whether a search and seizure of an open barn or shed without a search warrant is within the constitutional prohibition it is unnecessary to determine, as the undisputed evidence is that defendants knew that the search and seizure had been made without a search warrant long before the trial, and no effort was made to prevent the use of the property seized until the cigar box and the $20 bill were offered in evidence. It was then too late, as it raised a collateral issue and "would halt the orderly progress of a cause, and consider incidentally a question wholly independent thereof." Adams v. New York, 192 U. S. 585, 24 Sup. Ct. 372, 48 L. Ed. 575; Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Wiggins v. United States, 272 Fed. 41, 44 (2d C. C. A.); Cabiale v. United States, 276 Fed. 770, 772 (9th C. C. A.).

The defendants committed a brutal assault on Gifford, robbed him of his money on the public highway, for no other reason than because he had accepted employment to provide a means of livelihood for himself and family, all of it in violation of the letter and spirit of the injunction.

The judgments are affirmed.